AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | |
|---|---|
| United States of America<br>v.<br>Romell Deshawn Knutt,<br><br>*Defendant(s)* | Case No. 5:25-mj-00512 |

LODGED
CLERK, U.S. DISTRICT COURT
08/01/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: AP DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
08/01/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: REC DEPUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of July 31, 2025 in the county of Riverside in the Central District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 8 U.S.C. § 1324(a)(1)(A)(ii) | Transportation of Illegal Aliens |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

*/s/ Darwin Anderson*
*Complainant's signature*

Border Patrol Agent, Darwin Anderson
*Printed name and title*

Sworn to before me and signed in my presence.

Date: August 1, 2025

*[signature]*
*Judge's signature*

City and state: Riverside

Honorable David T. Bristow, U.S. Magistrate Judge
*Printed name and title*

*AUSA:* John A. Balla (x6246)

**AFFIDAVIT**

I, Darwin Anderson, being duly sworn, declare and state as follows:

**PURPOSE OF AFFIDAVIT**

1. This affidavit is made in support of a criminal complaint against Romell Deshawn KNUTT ("DEFENDANT") for a violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii) (Transportation of Illegal Aliens).

2. This affidavit is also made pursuant to 18 U.S.C. § 3144 and in support of the government's motion for designation of one material witness, identified below, in connection with the criminal complaint sought herein against DEFENDANT for a violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii) (Transportation of Illegal Aliens).

3. This affidavit is also made in support of an application for a warrant to search one digital device, a black iPhone Pro Max (the "SUBJECT DEVICE"), seized from DEFENDANT on July 31,2025, and currently in the custody of United States Border Patrol ("USBP"), in Indio, California, as described more fully in Attachment A.

4. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 8, United States Code, Sections 1324(a)(1)(A)(v)(I), (a)(1)(B)(i) (Conspiracy to Transport and Harbor Aliens in the United States); 1324(a)(1)(A)(ii), (a)(1)(B)(i) (Transporting Illegal Aliens for Private Financial Gain); and 1324(a)(1)(A)(iii), (a)(1)(B)(i) (Harboring Illegal Aliens for

Private Financial Gain) (collectively, the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

5.   I was not involved in the arrest of DEFENDANT, his Mirandized interview, or the interview of the material witness. The facts set forth in this affidavit are based on my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested complaint and search warrant, and that there are sufficient facts to establish that the testimony of the proposed material witness is material in a criminal proceeding, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### BACKGROUND OF AFFIANT

6.   I am a United States Border Patrol Agent ("BPA") with the Department of Homeland Security, Customs and Border Protection, United States Border Patrol ("USBP").  I have been employed as a full-time, sworn federal BPA with the USBP since August 21, 2016, and graduated from the USBP Basic Border Patrol Training Academy located in Artesia, New Mexico.  The Academy curriculum covers specialized training in the Immigration and Naturalization Act, criminal law, and statutory authority, as

well as cross-training in Title 21, United States Code, Controlled Substances law, and in Title 19, United States Code, Customs law.

7. During my employment with USBP, I have participated in alien smuggling investigations that have resulted in federal criminal charges. In connection with that work, I have made arrests, prepared reports in federal proceedings, and provided sworn statements in federal criminal proceedings. My work also has included speaking with suspects, cooperating witnesses, and other law enforcement personnel regarding the different methods by which the crime of alien smuggling is committed.

8. Through my experience, I have gained a working knowledge and insight into the typical workings of criminal alien smuggling organizations. I also have gained extensive information regarding the normal operational habits of persons who make their living as alien smugglers, including the behavior, speech, routes, and methods of operation of alien smugglers to avoid detection and apprehension by law enforcement officers.

### STATEMENT OF PROBABLE CAUSE

9. Based on my review of incident reports, conversations with other law enforcement agents, and data contained in Department of Homeland Security databases, I am aware of the following:

### Traffic Stop and Initial Investigation

10. On July 31, 2025, BPA Herrera and BPA A. Toral, were assigned to roving patrol on Interstate 10. They were wearing

3

rough-duty Border Patrol uniforms including identifying insignia and a badge.  They were operating a marked Border Patrol vehicle equipped with lights and sirens.  BPA Toral has over 19 years' experience as a BPA and has been involved in apprehending and investigating numerous smuggling events along the Interstate-10 ("I-10") corridor throughout his career.  He is familiar with the appearance, behavior and tactics exhibited by people involved in smuggling contraband.

    11.  BPAs Toral and Herrera were observing westbound traffic on I-10, approximately 7 miles east of Dillon Road, looking for indicators of criminal activity.  I-10 is the southernmost east-west, coast-to-coast interstate highway in the United States.  I-10 stretches from California to Florida.  Intertate-8 is notable as it is the southernmost interstate highway in California that runs parallel to the United Staes/Mexico border.  Based on their training and experience, BPAs Toral and Herrera know that illicit contraband and people being smuggled across the border will reach the I-8 and be picked up to be further smuggled inside the United States.  Unlawful aliens being smuggled are then often taken smuggled I-10 to avoid Border Patrol Checkpoints.

    12.  At approximately 6:30 a.m., BPAs Toral and Herra observed a black, four-door Nissan Rogue ("Nissan") bearing a temporary California license plate pass their location heading westbound on I-10 in the number one lane (farthest left).  The Nissan caught their attention because, during BPA Toral's 19 years as a BPA, he has encountered many vehicles that switch

their permanent license plates to state paper plates, dealership advertisement plates, or another vehicle's plate to avoid being detected by law enforcement.

13. BPA Toral could clearly see a driver through the window but no front passengers. Due to the tint on the rear passenger-side window, BPA Toral could only see an outline of what appeared to be a person moving in the rear seat. This was suspicious to BPA Toral because it is not common for passengers to sit in the rear passenger seat when there is a vacant front passenger seat.

14. BPA Toral pulled onto the highway and followed to further investigate the Nissan. After about four miles, BPA Toral positioned his vehicle behind the Nissan. The Nissan remained in the number one lane and remained at approximately 85 mph for a short time. Suddenly, the Nissan slowed significantly from approximately 85 mph to 50 mph.

15. As BPA Toral followed the vehicle, he saw the vehicle touching the fog line and lane divider line on multiple occasions. BPA Toral knows that this is often caused by driver's fixation on their rearview mirrors. At this time, BPA Toral no longer saw the rear passenger silhouette, which led BPA Toral to believe that the rear passenger was likely trying to conceal him or herself. It is common practice for smugglers to position their illegal aliens in the rear passenger seats or cargo areas to conceal their presence from law enforcement. BPA Toral pulled alongside the vehicle and could see that the driver was sitting upright in the seat, eyes wide, and continuing to

stare forward.  From BPA Toral's training and experience, smugglers and illegal aliens often avoid eye contact out of fear of being detected and act nervous in the presence of Border Patrol.

16.   At approximately at 6:45 a.m. BPA Toral called the El Centro radio dispatch to request record checks on the Nissan. Dispatch relayed that the vehicle's temporary paper license plate had already been assigned a California License plate.  The vehicle was registered out of Los Angeles, California.  It is suspicious that the Nissan still had a temporary plate affixed rather than the permanent assigned plate.

17.   Based on the aforementioned facts and observed behaviors, BPA Toral believed that he was likely witnessing an alien smuggling event and decided to conduct a vehicle stop to further investigate.  BPA Toral pulled behind the Nissan and activated his emergency lights.  The Nissan yielded east of the Golf Center Parkway exit ramp.

18.   BPA Toral approached the passenger's side of the Nissan.  BPA Toral identified himself as a BPA and asked the driver, later identified as DEFENDANT, as to his citizenship, to which he responded "US."  At this time, BPA Toral saw an individual hunched over in the rear passenger seat, attempting to conceal himself.

19.   BPA Toral questioned the passenger in the rear seat, later identified as Daniel VILLA-Rosales, also known as "Salvador BILLA Rosales" ("MAT-WIT"), as to his citizenship. MAT-WIT admitted to being in the United States illegally.

20. MAT-WIT was placed under arrest. Blanket shoe wraps were discovered in the vehicle. It is common practice for persons, illegally entering the United States, to wrap their shoes to conceal their footprints while illegally entering the United States.

21. BPA D. Hamburger placed DEFENDANT under arrest for alien smuggling. BPA Toral placed MAT-WIT under arrest for illegal entry of an alien. Both DEFENDANT and MAT-WIT were transported to the Indio Border Patrol Station for further interview and processing.

22. At the time of arrest, DEFENDANT had the SUBJECT DEVICE in his hand and acknowledged ownership.

23. At the Indio Border Patrol Station, records checks revealed that DEFENDANT has an extensive criminal history including Assault with Force Likely to Produce Great Bodily Injury, First Degree Burglary, Second Degree Burglary, First Degree Street Gang Act, and Felon/Addict with possession of a Firearm. MAT-WIT's fingerprints were entered into the Biometrics IDENT IAFIS database, which revealed that MAT-WIT has no criminal convictions.

**Video-Recorded Interview of MAT-WIT**

24. During a recorded sworn statement, after being read his Miranda rights, MAT-WIT stated that he is a citizen of Mexico and does not possess immigration documents allowing him to enter or remain in the United States. MAT-WIT stated his true name is Daniel VILLA-Rosales. MAT-WIT stated that he used his brother's name "Salvador BILLA-Rosales" when he got deported

7

the last time he was arrested by USBP.  MAT-WIT stated that he made all the smuggling arrangements with a Tijuana smuggler that goes by the name of "El Fantasma" and agreed to pay a total of $7,500 U.S. dollars.  MAT-WIT's destination was Los Angeles, California.  MAT-WIT stated that on July 29, 2025, he flew from Puebla to Tijuana, Mexico, and was instructed to wait at the airport for a "DiDi driver" to pick him up.

25.   MAT-WIT stated he was traveling with a friend who was also trying to enter the US illegally, but they were separated along the way.  MAT-WIT stated that the "DiDi driver" picked them up and took them to a bust stop near a supermarket.  MAT-WIT was instructed to travel via bus from Tijuana to Tecate "El Hongo."  MAT-WIT stated he was picked up by a white pickup truck and taken to a small trailer outside the city.  MAT-WIT stated he stayed at the trailer for a couple of hours before being transported to the U.S/Mexico border fence.  MAT-WIT said he was guided by a young male using a walkie talkie and crossed the border fence by climbing over it with the help of a rope and ladder.  MAT-WIT stated that once he was across, the foot guide communicated with him via the walkie talkie telling him where to go.  MAT-WIT stated he walked approximately one hour before reaching a light tower near a highway.

26.   MAT-WIT stated he waited approximately half an hour on the side of the road waiting for someone to pick him up.  MAT-WIT stated an SUV arrived at his location and was instructed to get in the back seat.  MAT-WIT described the driver as a chubby back male with short hair.  MAT-WIT stated that the driver did

not speak Spanish and would constantly be on the phone with the other smugglers every time he wanted to ask him something. MAT-WIT stated that the vehicle only stopped twice to purchase fuel.

27. MAT-WIT stated that the driver and himself were the only people in the vehicle before being stopped by USBP. MAT-WIT stated that all occupants of vehicle got arrested after he admitted to being in the United States illegally, and the interview concluded.

### DEFENDANT's Recorded Interview

28. DEFENDANT was read his Miranda rights and agreed to speak with agents. DEFENDANT stated he is a United States citizen who was born in Los Angeles. DEFENDANT stated he was driving his girlfriend's vehicle at the time he was arrested by BPAs. DEFENDANT stated he is a drug addict and was giving the person he was traveling with a ride to Los Angeles to make some money to buy drugs. DEFENDANT stated he was not aware that transporting illegals was a crime. DEFENDANT stated he just wanted to make some money to get high. DEFENDANT stopped answering agents' questions, and the interview was concluded.

### TRAINING AND EXPERIENCE ON ALIEN SMUGGLING

29. Based on my experience and training, I am familiar with the methods employed in smuggling operations and the smuggling patterns employed by such organizations. I have also spoken with other experienced agents and other law enforcement officers about their experiences and the results of their investigations and interviews. I have become familiar with the methods of operation typically used by alien smugglers. Based

on my training, experience, my conversations with other law enforcement officers, and my knowledge of this investigation and others, I am aware of the following:

    a. Alien smuggling is generally a continuing criminal activity taking place indefinitely unless interrupted by law enforcement action. Indeed, based on my training and experience, individuals who have established an income based on smuggling tend to continue the activity for prolonged periods of time because that is how they make a living.

    b. Alien smugglers often use one or more telephones, pagers, or other digital devices, sometimes in fictitious and/or other individuals' names, to communicate with other participants in their smuggling operations, including co-conspirators and customers, regarding matters such as price, arrival time, and meet location. This communication can occur by phone, text, email, or social media. Alien smugglers maintain in such devices telephone and other contact information which reflects names, addresses, and/or telephone numbers of their associates in the alien smuggling organization, as well as customers of the alien smuggling business. Further, alien smugglers will also use text messages to send photographs as codes or actual pictures or videos. I know that the above-described information can be stored on digital devices carried by alien smugglers.

    c. In addition, I know that professional smuggling operations depend upon maintaining both long-distance and local contacts with individuals in the source country who

arrange the initial payment and embarkation, as well as those in the United States who facilitate arrival and collection of any remaining smuggling fees.  Smugglers often use fraudulent information to subscribe to cellular telephones, maintain separate customer and supplier telephones, and frequently change cellular telephones to thwart law enforcement efforts to intercept their communications.  Smugglers frequently use pre-paid telephones and/or false or misleading subscriber information as a way of distancing themselves from criminal liability.

        d. Individuals involved in human smuggling commonly obtain partial payment from customers prior to embarkation and accept the remaining payment upon safe arrival in the United States.  Therefore, I am aware that individuals involved in human smuggling maintain books, customer lists, receipts, notes, ledgers, and other records relating to the negotiated price for a customer and any partial payments made or due, and that such documents may be in code to attempt to thwart law enforcement detection.

        e. Smugglers keep records of their illegal activities for a period of time extending beyond the time during which they actually transport a particular customer, in order to maintain contact with criminal associates for future smuggling operations, and to have records of prior transactions for which, for example, they might still be owed payment, or might owe someone else money

    f. Alien smugglers frequently use Global Positioning System ("GPS") devices to navigate.  I know that GPS devices often store route history information of previously travelled routes.

    g. Data contained on digital devices used by smugglers often include, among other things, records of telephone calls, text messages, e-mail and social media communications between the smugglers and the co-conspirators; Global Positioning System ("GPS") information and other location information that can help identify embarkation and landing locations, meeting places, and smuggling routes; and identifying information about the smuggler and co-conspirators, such as contact lists, calendar appointments, and photographs or videos.

### TRAINING AND EXPERIENCE ON DIGITAL DEVICES

 30. As used herein, the term "digital device" includes the SUBJECT DEVICE.

 31. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the

Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

   b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures

are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    32. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

        a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

        b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

    33. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

        a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical

feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

34. The person who was in possession of a device or had the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress DEFENDANT's thumb- and/or fingers on the SUBJECT DEVICE; and (2) hold the SUBJECT DEVICE in front of DEFENDANT face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

35. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## CONCLUSION

36.   For all of the reasons described above, there is probable cause to believe that DEFENDANT has committed a violation of 8 U.S.C. § 1324(a)(1)(A)(ii) (Transportation of Illegal Aliens).

37.   Furthermore, there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses will be found on the SUBJECT DEVICE as described above and in Attachment A.

38.   Finally, for all the reasons described above, there is sufficient facts to establish that the testimony of MAT-WIT is material in a criminal proceeding and that MAT-WIT should be designated and detained as material witness pursuant to 18 U.S.C. § 3144 (release or detention of a material witness).

Attested to by the applicant
in accordance with the
requirements of Fed. R. Crim.
P. 4.1 by telephone on this
1st day of August 2025.

_____
HON. DAVID T. BRISTOW
UNITED STATES MAGISTRATE JUDGE

16